UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

**PHILADELPHIA INDEMNITY INSURANCE COMPANY A/S/O BALDWIN REAL ESTATE CORP.,**

                        Plaintiff,      1:19-CV-1456
   *- against -*                              (DNH/DJS)

**KATHLEEN BURKE BARKER,**

                        Defendant.

**DEFENDANT KATHLEEN BURKE BARKER'S
MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S
OPPOSITION TO DEFENDANT'S
MOTION TO PRECLUDE AND FOR SUMMARY
JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S
CROSS-MOTION TO PRECLUDE**

                                          **CABANISS CASEY LLP**
                                          Attorneys for Defendant
                                          *Kathleen Burke Barker*
                                          Office and Post Office Address
                                          4 Tower Place, Suite 100
                                          Albany, New York 12203
                                          Telephone (518) 621-4405
                                          Facsimile (518) 407-5644

Brian D. Casey, Esq.

## **TABLE OF CONTENTS**

**INTRODUCTION** ..................................................................................................1

**POINT I**       **DEFENDANT DOES NOT ARGUE PLAINTIFF MUST PROVE FAIR MARKET VALUE**............................................................................1

**POINT II**      **PLAINTIFF IS REQUIRED TO PRODUCE EXPERT TESTIMONY ON DAMAGES**................................................................7

**POINT III**     **PLAINTIFF'S INDEPENDENT ADJUSTER SHOULD NOT BE PERMITTED TO PROVIDE EXPERT TESTIMONY** ..........................12

**POINT IV**      **DEFENDANT DOES NOT CHALLENGE ONLY A PORTION OF PLAINTIFF'S DAMAGES** ........................................................................14

**POINT V**       **THE CROSS MOTION SHOULD BE DENIED BECAUSE THE CHALLENGED EXPERT REPORT IS A SUPPLEMENTAL, NOT REBUTTAL, REPORT**............................................................................15

**RELIEF REQUESTED**...............................................................................................17

## INTRODUCTION

Points I through IV below are in reply to plaintiff's opposition to defendant's motion to preclude and for summary judgment. Point V below is in opposition to plaintiff's cross motion.

## POINT I

### DEFENDANT DOES NOT ARGUE PLAINTIFF MUST PROVE FAIR MARKET VALUE

Plaintiff inexplicably represents to the Court that defendant has argued plaintiff must prove fair market value: "The Motion -- which does not attack Plaintiff's liability case but rather focuses only on Plaintiff's damages -- depends almost entirely on two presumptions: (1) that Plaintiff *must* establish the fair market value of the subject property and (2) that Plaintiff is required to produce expert testimony to establish its damages." (See plaintiff's memorandum of law at p. 1; emphasis added.) Defendant made no such argument.

Rather, defendant clearly argued that New York law permits recovery of either fair market value or the cost to restore, that plaintiff must prove one of those measures and, if both measures are in evidence, then plaintiff is entitled to the lesser amount: "In New York, damages to real property are measured by either the reasonable cost of restoring the property to its pre-loss condition (repair or replacement cost) *or* the diminution in market value of the property, whichever is less." *** "A plaintiff must introduce evidence of at least *one* measure of property damages (repair or replacement cost vs. diminution in market value), but the availability of an alternative remedy allows a defendant to prove that a lesser amount, than that claimed by plaintiff, will sufficiently compensate plaintiff for the loss." (See defendant's 12/29/20 memorandum of law at pp. 8-9; emphasis added). Plaintiff's representation that defendant argued plaintiff "must establish fair market value" is, thus, unfounded, without a good faith basis, and contrary to defendant's articulated position.

Perhaps more importantly, however, defendant also argues a related point that plaintiff has ignored altogether -- that the damages which plaintiff seeks to prove are what plaintiff paid to its insured, which is not an acceptable measure of damages under New York law. (See, e.g., defendant's 12/29/20 memorandum of law at p. 7: "Indeed, defendant has only been apprised of what plaintiff paid its insured in a negotiated settlement of the underlying insurance claim.") The problem here for plaintiff is that what it paid its insured, under the terms of the insurance policy and/or pursuant to a negotiated settlement, is different from what may be recovered in a subsequent tort action. For example, this particular policy may well have provided for "code upgrades" coverage, meaning that plaintiff's insured was entitled to recover not only for the cost to restore the building as it stood immediately prior to the fire, but to recover for "code upgrades," as well. Put another way, the insurance policy may have provided a broader and more extensive recovery to plaintiff's insured than is available to plaintiff in this action under New York tort law.

Although somewhat difficult to believe that the plaintiff insurance carrier truly fails to understand this point, perhaps that is the case and, if so, it may be helpful to explore what would have happened if there was no policy of insurance and plaintiff's insured was simply left with a tort claim against defendant. Under that scenario, instead of a contractual right of recovery under an insurance policy -- and as defined by that policy -- the non-insured apartment building owner would be left only with whatever recourse New York State tort law affords, meaning recovery of either the diminution in fair market value of the property or the cost to restore the property. *See New York Cent. Mut. Ins. Co v. TopBuild Home Servs.*, 2019 U.S. Dist. LEXIS 69634, 13, 2019 WL 1791844 (EDNY 2019) (rejecting subrogating insurance carrier's position, that it should be permitted to recover what it paid to its insured, as unsupported in law: "As Plaintiff is stepping into Mr. Mazzola's shoes, it too can only recover the diminution in value. The fact that Mr. Mazzola

2

has received over $1,000,000 from Plaintiff pursuant to a privately negotiated insurance contract does not change the analysis.")  There is no right under New York tort law to recover the cost to restore and then additional amounts for code upgrades or other improvements.  Recovery is limited to the cost to restore, and nothing more.  Put another way, if plaintiff had a Chevy before the fire, then plaintiff is entitled to a Chevy after the fire, but not a Cadillac.

Plaintiff in this matter is seeking a Cadillac when it had a Chevy.  The pre-fire apartment building lacked the upgrades that plaintiff paid for -- including upgraded insulation, upgraded windows, upgraded faucets, upgraded hot water heaters, and upgraded kitchen vents.  (Plf's Ex. B at p. 116.)  Some of the items slated for upgrade had not even been damaged by the fire:  "The insured's contractor shows a large number of code issues for items not affected by the fire loss including replacement of all the windows, hot water heaters and faucets to mention a few …" (Plf's Ex. A at PL000376).

Perhaps plaintiff was contractually obligated, under the terms of its policy, to pay for such upgrades, or perhaps plaintiff and its insured negotiated payment for such upgrades.  But plaintiff in this tort action merely stands in the shoes of its insured, meaning plaintiff may recover in tort nothing more than its insured could recover in the absence of insurance.  *See Fed. Ins. Co. v. Arthur Andersen & Co.*, 75 N.Y.2d 366, 372 (1990) (rights of subrogating insurer against a third party are derivative and limited to only those rights the insured would have had against the third party for the alleged wrongdoing; thus, the insurer may only recover if the insured could have recovered, and the insurer's subrogation claim is subject to whatever defenses the third party might have asserted against the insured).

The point here is that plaintiff, by disclosing 10 reports, spanning more than 500 pages, from its independent adjuster, Sedgwick, purporting to show what plaintiff paid to its insured under

3

the terms of the insurance policy, does not establish or show what plaintiff is entitled to recover in this tort action. The payment by plaintiff for "code upgrades," standing alone, makes the two things quite different and not interchangeable.

But in this matter, the Sedgwick materials and the deposition testimony of the Sedgwick representative, Christopher Vaughn, show that what plaintiff paid to its insured is not a reflection of the cost to restore the property, even when "code upgrades" are set aside. This is true because, as alluded above, the payment by plaintiff to its insured was the product of a negotiated settlement between the two.

Remarkably, in footnote 2 of its memorandum of law, plaintiff writes: "Although Defendant characterizes Plaintiff's damages figure as 'a negotiated, agreed upon settlement of the fire loss claim' (see SMF par. 10) -- with the implication that the figure is somehow unsupported and therefore should be disregarded -- there is no support for this characterization in the record." To the contrary, the record is replete with support for the characterization that plaintiff's damages are the product of "a negotiated, agreed upon settlement of the fire loss claim." And all of that support comes straight from Christopher Vaughn, the Sedgwick representative who was retained by plaintiff and reported developments in the claim process to plaintiff.

The first indication that this was a negotiated, agreed upon settlement is found in Mr. Vaughn's first report, dated April 26, 2019, where he wrote: "Once the estimate has been provided by JS Held, we will review the work product and provide it to you for review and approval before sending it to the Public Adjuster in the efforts of securing an agreed." (Plf's Ex. A at PL000003.) So, from day one, Mr. Vaughn's intention was to secure an agreement to a number acceptable to both the plaintiff insurance carrier and its insured.

In Mr. Vaughn's second report of May 30, 2019, he wrote the following concerning the building claim: "The estimate from JS Held was provided to the PA [public adjuster] in the attempt to secure an agreed repair figure. As of this date we have not received anything further from the PA including an agreed." Concerning the loss of rent claim, he wrote: "According to the consultant the time period of restoration is five months. The loss occurred on April 06, 2019. We still do not have an agreed figure and as of today it has been fifty-four days." (Plf's Ex. A at PL000136.)

In Mr. Vaughn's third report of July 22, 2019, he made unmistakably clear what was going on: "We believe there will likely be increases in the final estimate from a *negotiated settlement* consideration once all costs have been submitted." (Plf's Ex. A at PL000181; emphasis added.)

In Mr. Vaughn's fifth report of September 17, 2019, he wrote: "As you will note below, according to the PA the insured will not work with them to settle the claim. They are telling the PA to use their figures to settle the claim without support." (Plf's Ex. A at PL000379.) Mr. Vaughn elaborated: "We received a call from the PA asking for consideration of RCV [replacement cost value] figure of $680,000.00 to settle the claim. He said the insured will not cooperate with them and they, the PA are looking to settle the claim and move on and away from this insured." (Plf's Ex. A at PL000381.)

In Mr. Vaughn's deposition, he repeatedly confirmed this was a negotiated, agreed upon settlement. By way of examples, he testified: "I did not write the estimate. The estimate was prepared by J.S Held, Rick Mouris, and then negotiated with Steve Bisgrove at NFA [the public adjuster], and Sal -- I think it's Abooza [sic]. I forget his name." (Plf's Ex. B at p. 13.) "He [referring to Rick Mouris] was -- if he was working with anybody, he was working to negotiate the figures with [public adjuster] NFA ." (Plf's Ex. B at p. 47.) "[I]t's honestly, I think the first claim I've ever had that the PA wouldn't tell us who the contractor was. At the end of the day,

5

they did, and we found that they were, you know, a part of the ownership of the building, you know? But that -- to the insurance company, that didn't matter any longer because there was an agreed figure between NFA and the contractor." (Plf's Ex. B at p. 62.) "Rick Mouris of JS Held would have gotten as much detail as he could pertaining to the building, come to an agreed figure with NFA, Sal Bouza, if I remember. And that's how the claim would have been worked on and concluded." (Plf's Ex. C at pp. 17-18; second day of deposition testimony.) "But the long and the short is that JS Held prepares an estimate, gets an agreed with NFA. NFA agrees to it. *If DiMarco did the work for a dollar, it wouldn't make any difference to the extent of damage.*" (Plf's Ex. C at p. 18; emphasis added.) "I mean this claim had gone on for so long, you lost track of what we received." (Plf's Ex. C at p. 25.)

To call this anything other than a negotiated, agreed upon settlement, as plaintiff does in its memorandum of law, is to disregard the truth of the record. The bottom line is that Plaintiff, had it served competent expert disclosure regarding damages, would be free to prove the cost to restore the property to its pre-fire condition, but the Sedgwick reports by Mr. Vaughn do not account for that cost and, instead, reflect only a long process of negotiating an agreed upon settlement figure between plaintiff and its insured. Plaintiff here rolled the dice and served no expert disclosure regarding damages, which plaintiff has conceded. (See plaintiff's response to statement of material facts at par. 25-27 and 29-31.) The Sedgwick reports, establishing nothing more than what plaintiff paid following long settlement negotiations, cannot save plaintiff's claim.

## POINT II
## PLAINTIFF IS REQUIRED TO PRODUCE EXPERT TESTIMONY ON DAMAGES

Plaintiff's argument that it is not required to produce expert testimony regarding damages cannot be squared with the record facts or applicable law. The average juror may well understand that the fire caused damage in a general sense. However, when the issue for resolution is the post-fire cost to restore a 4 unit apartment building, located in Lowville, New York and originally constructed in 1983, then the average juror will need testimonial assistance from an expert. The applicable jury instruction concerning damages is:

> "If plaintiff's (automobile, property) was damaged by the defendant's negligence, you will award to the plaintiff as damages the difference between its market value immediately before and immediately after it was damaged, or *the reasonable cost of repairs necessary to restore it to its former condition*, whichever is less. Thus, if the reasonable cost of repairs exceeds the reduction in market value, you will award the amount by which the market value was reduced. If the reasonable cost of repairs is less than the reduction in market value, you will award to the plaintiff *the reasonable cost of repairs required to restore the (automobile, property) to its condition immediately before it was damaged*."

N.Y. Pattern Jury Instr.--Civil 2:311 (Damages -- Property with Market Value) (emphasis added).

Parsing that out may be helpful. The jury will be charged with determining not what plaintiff paid, and not simply the raw cost of repairs, but the *reasonable cost of repairs*. And even then there is the further qualification that the jury may award only those reasonable costs necessary to *restore the property to its pre-fire condition*. Perhaps a layperson could testify to what was actually spent restoring the four unit apartment building following the fire, which is simply a matter of tallying up receipts, but expertise is necessary to establish that the costs were reasonable and that the costs were necessary to put the property back to its pre-fire condition.

7

Expert testimony is unnecessary where jurors are as capable of comprehending the primary facts and drawing correct conclusions from them as are witnesses possessed of special training. *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004). The corollary is that expert testimony will be needed when the jurors are faced with issues of greater complexity.

Instructive in that regard is *De Long v. Erie Cty.*, 60 N.Y.2d 296 (1983). In *De Long*, the Court of Appeals addressed the appropriateness of expert testimony to establish the value of services provided in the home. The Court drew a distinction between the likelihood that jurors would be generally aware of the types of services a homemaker might provide, and whether the jurors would have an understanding of the monetary value of those services:

> "Undoubtedly most jurors have at least a general awareness of the various services performed by a housewife. It is doubtful, however, that they are equally knowledgeable with respect to the monetary equivalent of those services. Although it was once thought that this was not a subject which would lend itself to scientific inquiry and analysis, that can no longer be said today. It is now apparent, as a majority of courts have held, that qualified experts are available and may aid the jury in evaluating the housewife's services not only because jurors may not know the value of those services, but also to dispel the notion that what is provided without financial reward may be considered of little or no financial value in the marketplace. We conclude that it was not an abuse of discretion to allow the expert testimony in this case."

*Id*. at 307–08 (internal citations omitted).

The case at bar is similar. While the average juror will certainly understand that a fire may cause damage in a general sense, the average juror, unaided by expert testimony, will not understand what costs are necessary to restore the property to its condition immediately prior to the fire and whether the claimed costs are reasonable or not. For example, the average juror would not have a fair understanding of what would be involved with debris removal (meaning how many laborers, their hourly rates, and equipment costs), what part or parts of the building might be salvaged or used in the restoration process, whether areas impacted only by water or smoke, as

8

opposed to fire impingement, might require cleaning only and not full blown reconstruction, the number of laborers and their corresponding wages required for the restoration work, whether design professionals such as engineers or architects are necessary or not, and the reasonable costs of the equipment, tools, and materials necessary for the restoration work.  The average juror is highly unlikely to have any first-hand experience with the restoration of a fire damaged apartment building, let alone the level of sophistication necessary to understand that process without the benefit of expert testimony.  Plaintiff's argument to the contrary ignores that reality and is simply one of convenience because plaintiff failed to serve expert testimony on the issue of damages.

Further, Christopher Vaughn's reports and deposition testimony show that post fire loss construction work is complicated and necessitates expert proof.  To start, it is observed that Mr. Vaughn's reports and the attachments to those reports run 512 pages.  While not dispositive of the issue, if the matter was sufficiently simple then arguably nothing close to 512 pages would have been required for Mr. Vaughn to effectively report the matter to the plaintiff insurance carrier, which deals with property damage claims as a matter of daily business.

Setting that aside for the moment, the Vaughn reports make clear that Sedgwick retained JS Held as a consultant.  Again, if the matter was a simple one, then there should be no need for Sedgwick and Mr. Vaughn to retain a consultant such as JS Held.  But even JS Held's point person for the job, Rick Mouris, required a consultant:  "[W]e were told by Mr. Mouris of JS Held that NFA is working on an addition to their estimate to include code issues.  JS Held suggest[s] we utilize their engineering division regarding the code potential issues."  (Plf's Ex. A at PL000181).  This actually came to pass:  "Mr. Mouris of JS Held has requested assistance from an engineer familiar with New York State codes including the energy code.  This engineer has assisted Mr. Mouris with interpretation and determining what is and is not needed or required.  They are ready

9

to assist further is [sic] needed." (Plf's Ex. A at PL000380; see also PL000386). Clearly the issue of damages is not simple and required experts in the field. And if experts were needed in the field, they are no less needed in the courtroom.

The complexity of the matter of damages is also seen in Mr. Vaughn's deposition testimony. For example, Mr. Vaughn testified: "We live in New York State. There are continuous code requirements, and they're always changing." (Plf's Ex. B at 28.)

Mr. Vaughn showed a lack of familiarity with Xactimate (the estimating software used by JS Held):

Q: All right. Would the Xactimate include code upgrades for new construction?

A: I know that it's state specific, so it might --

Q: Okay.

A. -- but I honestly can't answer that question. (Plf's Ex. B at 72.)

Mr. Vaughn also showed a lack of familiarity with the estimates of Rick Mouris of JS Held: "I couldn't -- I can't sit here and tell you about what was changed in Rick Mouris's estimate." (Plf's Ex. B at 106.) And he was also unfamiliar with Mr. Mouris's dealings with the insured's design professional, an architect:

Q: All right. And was it your understanding that Mr. Mouris had requested more detail from the architect?

A: Yeah. He was much more involved in that aspect than I was.

\*\*\*

Q: I understand that. I'm just asking you if there had actually been a list prepared of what those upgrades were and the cost of each of them.

A: I'm not familiar with that. (Plf's Ex. C at 11-12; second day of testimony.)

10

Mr. Vaughn's reports and testimony show that the damages aspect of the claim was complex, arguably exceedingly complex, requiring input from multiple consultants, including those who presumably had expertise in commercial construction, codes, engineering, and architecture. Nevertheless, plaintiff maintains the jury in this matter should have no such assistance.

The cases cited by plaintiff on this point are inapposite. Plaintiff's cases deal with testimony by a plaintiff property owner to establish the market value of its own property. *See Tulin v. Bostic*, 152 A.D.2d 887, 887-88 (3d Dept. 1989) (owner may testify to market value of automobile); *Park West Mgmt. Corp. v. Mitchell*, 47 N.Y.2d 316, 329-330 (1979) (tenant in statutory breach of warranty of habitability action permitted to testify to diminution in value of leasehold due to uncollected garbage piling up at premises; Court observed the New York State Legislature specifically authorized lay witness testimony on the issue in RPL 235-b[3]); *United States v. 25.202 Acres of Land*, 860 F. Supp. 2d 165, 182-83 (NDNY 2010) (owner may testify to market value of real estate). So, while there may be circumstances where a property owner could competently provide testimony concerning the market value of his or her property, plaintiff here proposes nothing of the sort and, instead, is determined to plow ahead with proof of "what it paid" its insured following a negotiated settlement process. Because plaintiff does not propose to call the owner of the apartment building to testify to the diminution in market value the building sustained due to the fire, the cases cited by plaintiff have no bearing on the outcome of defendant's motion for summary judgment and should be disregarded.

## POINT III
### PLAINTIFF'S INDEPENDENT ADJUSTER SHOULD NOT BE PERMITTED TO PROVIDE EXPERT TESTIMONY

As an initial matter, plaintiff has not formally noticed a cross motion for leave to designate a damages expert at this late date.  Instead, plaintiff suggests in its memorandum of law in opposition to defendant's motion for summary judgment that, if the Court determines the issue of damages requires expert proof, then plaintiff "should be permitted to designate its independent adjuster, Christopher Vaughn, as an expert on the issue of damages given his many years as large loss property adjuster."  (Plf's memorandum of law at p. 8.)  Plaintiff's failure to pursue a properly noticed cross motion for leave to serve expert disclosure with respect to Mr. Vaughn (or anyone else) on the issue of damages should be deemed fatal and the informal application denied.

However, should the Court decide to consider the merits of that application by plaintiff, the Court should still deny it.  To begin with, disclosure by plaintiff of experts was due in August 2020, and we are now well beyond that deadline. Plaintiff has offered no excuse for the failure to designate a damages expert, with the possible exception of plaintiff's mistaken belief that an expert on the issue is not required.   Although defendant deposed Mr. Vaughn, that was a fact witness deposition, not a deposition of Mr. Vaughn as a designated expert witness.  If plaintiff is permitted to designate Mr. Vaughn as a damages expert, then defendant will need time to review whatever expert disclosure plaintiff serves on Mr. Vaughn's behalf, likely consult with a damages expert regarding that disclosure, likely serve responding expert disclosure, and notice and take Mr. Vaughn's deposition as an expert.  None of that is warranted at this late stage of the litigation.

Further, as a practical matter, the record shows that Mr. Vaughn is not an appropriate candidate for disclosure by plaintiff as a damages expert.  This is true for several reasons.

First, as referenced above, Mr. Vaughn lacks first-hand knowledge of the critical damages issues addressed in his ten reports to plaintiff. Plaintiff retained Sedgwick, Mr. Vaughn's employer. Sedgwick then retained a building consultant, JS Held, which employed Rick Mouris. It was Mr. Mouris who did the actual "estimating work" and "negotiating" with plaintiff's insured or plaintiff's insured's representative, meaning NFA, the public adjuster. (Plf's Ex. B at 13 and 47, and Plf's Ex. C at pp. 17-18.) Mr. Vaughn simply conveyed to plaintiff whatever information he received from Mr. Mouris. For some issues, Mr. Mouris lacked sufficient expertise and required input from an engineer. (Plf's Ex. A at PL000380 and PL000386.) Mr. Vaughn is unfamiliar with the details of Mr. Mouris's work, including with respect to changes in Mr. Mouris's estimates and concerning code upgrades. (Plf's Ex. B at 106 and Plf's Ex. C at 11-12.) Permitting Mr. Vaughn to serve as an "expert" at trial, when his opinions will not be his own, but rather those of Mr. Mouris and/or the engineer who assisted Mr. Mouris, presents insurmountable evidentiary hurdles of foundation and hearsay. Mr. Vaughn would be testifying to estimates he did not prepare and based on out of court statements of Mr. Mouris, the engineer relied upon by Mr. Mouris, and perhaps others.

Second, even if those evidentiary issues could somehow be addressed by plaintiff, Mr. Vaughn's deposition shows he lacks the knowledge to serve as a damages expert given the facts of this case. Mr. Vaughn lacks the expertise to testify regarding code upgrade issues -- the extent of his knowledge of codes is that "they're always changing." (Plf's Ex. B at 28.) He lacks knowledge of the capabilities of the Xactimate software employed by Mr. Mouris to prepare the estimates that were used to negotiate a price. (Plf's Ex. B at p. 72.) And he lacks an understanding of why the post fire construction work was significantly delayed. For example, in his sixth report, dated October 15, 2019, more than 6 months after the date of the fire, Mr. Vaughn reported to

13

plaintiff: "For what ever [sic] reason the structure is still under repair." (Plf's Ex. A at PL000388.) Similarly, even at his fact deposition, when he had the benefit of looking back on the entire claim, he was at a loss why cleaning costs were part of claimed damages. (Plf's Ex. B at p. 66: "Honestly, I don't know. I mean, I don't know what cleaning you would do on a fire loss.")

Mr. Vaughn was not timely disclosed, lacks personal knowledge of the facts and opinions to which he would have to testify as an expert at trial, and lacks the expertise necessary to give helpful opinions at trial. Given all that, the Court should not grant plaintiff leave to designate Mr. Vaughn as a damages expert.

## POINT IV
## DEFENDANT DOES NOT CHALLENGE ONLY A PORTION OF PLAINTIFF'S DAMAGES

Plaintiff wrongly asserts that defendant challenges only a portion of plaintiff's damages. (See plaintiff's memorandum of law at page 10.) First, defendant, by its motion for summary judgment on the issue of damages, clearly challenges plaintiff's entire case, including all damages plaintiff may be claiming. Second, the damages expert disclosed by defendant, D.J. Estep, limited his analysis to what had been factually disclosed -- the Sedgwick reports concerning what plaintiff paid its insured following the settlement negotiation process. (See B. Casey 12/29/20 dec. at par. 14 and 15; and Defendant's 12/29/20 Statement of Material Facts at par. 17, 19, 20, 21, and 31.) As plaintiff made no disclosure of an expert report detailing the cost of restoration of the apartment building to its pre-fire status, Mr. Estep had nothing of the sort to assess or dispute. Plaintiff should not be permitted to blame Mr. Estep for its failure to serve expert disclosure concerning damages.

**POINT V**

**THE CROSS MOTION SHOULD BE DENIED BECAUSE THE CHALLENGED EXPERT REPORT IS A SUPPLEMENTAL, NOT REBUTTAL, REPORT**

Plaintiff's cross motion to strike Dr. McAllister's Supplemental Report, by characterizing it as a "rebuttal report," should be denied. Plaintiff provides the Supplemental Report to the Court, but makes no analysis of it. The substance of the report shows it is a Supplemental Report, as contemplated by FRCP 26 and, given its disclosure on December 30, 2020, was actually served early and cannot be considered a late disclosure.

Dr. McAllister's report, which is titled "Supplemental Report," makes clear that its purpose is to address three discovery items created after Dr. McAllister's initial report, and in particular referring to Mr. Vieau's rebuttal report, Mr. Vieau's deposition transcript, and plaintiff's response to defendant's post deposition discovery demands. The first purpose of the Supplemental Report is to address the baseless, speculative claim made by Mr. Vieau in his rebuttal report and his deposition testimony that "potting soil" or "peat moss" might somehow have been involved in the ignition of the fire. (See Plf's Ex. D at pp. 2-8 and 16.) The second purpose of the Supplemental Report was to address the location of a plastic planter, as identified by Mr. Vieau for the first time during his deposition testimony. (See Plf's Ex. D at pp. 8-16.)

Dr. McAllister's Supplemental Report required her to review and assess not only Mr. Vieau's rebuttal report, which was disclosed to defense counsel on October 19, 2020, but also Mr. Vieau's deposition transcript, consisting of approximately 167 pages of testimony, which was not received by defense counsel from the stenographer until November 1, 2020, as well as plaintiff's response to defendant's post deposition discovery demands to plaintiff, which plaintiff served November 16, 2020. (See B. Casey dec. dated February 2, 2021, at par. 5.) Plaintiff's November 16, 2020 response to defendant's post deposition request to produce is particularly

15

significant. The post-deposition discovery request, served by defendant November 2, 2020, which sought file materials that Mr. Vieau failed to bring with him to his deposition on October 20, 2020, became necessary because Mr. Vieau did not produce his entire file at the time of his deposition. (See B. Casey dec. dated February 2, 2021, at par. 5, Ex. D thereto.)  Plaintiff's response to the post deposition demand produced documents from Mr. Vieau's file that he had not produced at the time of his deposition, including fire scene diagrams, sketches, and his handwritten notes.  (See B. Casey dec. dated February 2, 2021, at par. 5, Ex. E thereto.)  Dr. McAllister was deposed on November 11, 2020 (see Plf's Ex. H), before service of plaintiff's response to defendant's post deposition request.  So Dr. McAllister, as of the date of her deposition, had not yet received all the materials that became the subject of her December 15, 2020 Supplemental Report, because some of those materials, namely those materials produced by plaintiff on November 16, 2020, had not yet been disclosed.

FRCP 26(a)(2)(E) requires parties to supplement previously served expert disclosure: "The parties must supplement these disclosures when required under Rule 26(e)."  FRCP 26(e) provides:

(1) In General. *A party who has made a disclosure under Rule 26(a)* -- or who has responded to an interrogatory, request for production, or request for admission -- *must supplement* or correct *its disclosure* or response:

(A) *in a timely manner* if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and *if the additional* or corrective *information has not otherwise been made known to the other parties during the discovery process* or in writing;

\*\*\*

> (2) Expert Witness. *For an expert … additions* or changes *to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due*.  (emphasis added)

FRCP 26(a)(3) requires that pretrial disclosures, unless otherwise ordered by the Court, "must be made at least 30 days before trial."

Dr. McAllister's Supplemental Report addresses only those limited issues raised by the new materials generated and disclosed by plaintiff well after Dr. McAllister's initial report was issued and, with respect to the portions of Mr. Vieau's file not produced at the time of his deposition, even after Dr. McAllister's deposition. Dr. McAllister's December 15, 2020 report makes clear she had more to say based on the new information. Dr. McAllister, in her December 15, 2020 report, made analysis of and commented upon those new materials, which calls for supplemental expert disclosure under the Rules, so that her opinions would be complete and fully disclosed.

Plaintiff in this matter received timely disclosure of Dr. McAllister's original report and then deposed Dr. McAllister. Plaintiff thereafter received early disclosure of Dr. McAllister's Supplemental Report, as that report was disclosed well before the FRCP 26(a)(3) deadline of 30 days prior to trial.  Plaintiff's cross motion, thus, essentially complains of too much, too soon expert disclosure.  There has been no violation by defendant of any Rule or Court Order and, accordingly, plaintiff's cross motion should be denied.

## **RELIEF REQUESTED**

Defendant respectfully requests that the Court grant her motion to preclude plaintiff from introducing expert evidence on the issue of damages and, upon preclusion, grant summary judgment dismissing the complaint with prejudice, deny plaintiff's cross motion in its entirety, and provide such further relief as deemed just.

| | |
|---|---|
| **DATED:**  February 2, 2021 | **CABANISS CASEY LLP**<br><br>*Brian D. Casey*<br>_____<br>Brian D. Casey<br>Bar Roll # 509962<br>*Attorneys for Defendant*<br>*Kathleen Burke Barker*<br>4 Tower Place, Suite 100<br>Albany, New York 12203<br>Phone (518) 621-4407<br>Fax (518) 407-5644<br>Email: brian@cabanisscasey.com |